**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 19-cr-522-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**1.    JOEL FLORES**,

    Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

---

The Government charges Joel Flores with one count of possession of a firearm and ammunition by a prohibited person, 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1) & (b)(1)(B)(viii), and one count of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i).  (ECF No. 56.)

Before the Court is Flores's Motion to Suppress and Request for Evidentiary Hearing ("Motion"), filed on June 15, 2020.[1]  (ECF No. 35.)  The Government responded on July 15, 2020 (ECF No. 46), and Flores replied on July 30, 2020 (ECF No. 55).  The Court finds that an evidentiary hearing is not necessary to resolve the

---

[1] Flores filed the Motion to Suppress in response to his original indictment.  (ECF Nos. 1, 35.)  After a superseding indictment was filed against Flores on August 5, 2020 (ECF No. 56), Flores filed a motion to renew his motion to suppress (ECF No. 63).  On August 21, 2020, the Court granted Flores's motion to renew and indicated that it would deem Flores's Motion to Suppress as applying to the Superseding Indictment, which is now the operative charging document in this case.  (ECF No. 64.)  Accordingly, in deciding the Motion to Suppress, the Court is mindful that it is applying the law and facts within the context of Flores's superseding indictment.

Motion. For the reasons set forth herein, the Motion is denied.

## I. FACTUAL FINDINGS

From the undisputed facts in the parties' briefs and exhibits thereto, the Court makes the following factual findings for purposes of deciding the Motion.

**A.    Officer Shea's Observations Regarding the Honda Civic**

On April 17, 2019, at approximately 2:18 a.m., Greeley Police Officer Shea was on patrol when he observed a white 2006 Honda Civic, traveling at a speed of approximately 25 miles per hour, heading south on 1st Avenue in Greeley, Colorado. (ECF No. 35 at 1; ECF No. 35-2 at 1.) After reportedly observing that the Civic's rear license plate was not illuminated, Officer Shea conducted a U-turn to stop the Civic.[2] (ECF No. 35 at 1–2; ECF No. 35-2 at 1.) Before Officer Shea could turn on his patrol lights, however, the Civic increased its speed to approximately 65 miles per hour. (ECF No. 35 at 2; ECF No. 35-2 at 1.)

While attempting a left turn on East 22nd Street, the Civic struck a curb, which caused the vehicle to come to a stop with both airbags deployed and the back windshield blown out. (ECF No. 35 at 2; ECF No. 35-2 at 1; ECF No. 46-1 at 28.) The vehicle's two occupants fled on foot in different directions. (ECF No. 35 at 2; ECF No. 35-2 at 1.) Officer Shea observed one male wearing a grey dark sweatshirt and who had a buzzed haircut and a facial tattoo—later identified as Flores—run south on 1st Avenue. (ECF No. 35 at 2; ECF No. 35-2 at 1–2.) Officer Shea requested assistance from responding officers. (ECF No. 35 at 2; ECF No. 35-2 at 2.)

---

[2] In his police report, Officer Shea also indicates that he observed the passenger and officer avoiding making eye contact with him. (ECF No. 35-2 at 1.)

### B. Search of the Civic

Officer McNerney responded to the request and helped Officer Shea search the Civic at the scene. (ECF No. 35-5 at 1.) Officer McNerney found a spent bullet casing in the center console. (*Id.*) Upon discovering the bullet, he informed the other officers over the radio that he had uncovered a spent casing in the Civic, and that the vehicle's occupants should be considered armed. (ECF No. 35-3 at 2; ECF No. 35-5 at 1.)

A subsequent search of the vehicle also yielded an empty plastic prescription bottle on the front seat with Flores's name on it, and a cell phone. (ECF No. 35-4 at 3–4; ECF No. 35-2 at 2.)

### C. Pursuit and Search of Flores

Greeley Police Officers Agnew, Hall, and Zong-Liscum arrived at the scene to search for the two individuals who had fled. (ECF No. 35-3 at 1; ECF No. 35-4 at 1.) After he completed searching the Civic, Officer McNerney and his canine, Cairo, also joined the search to find Flores. (ECF No. 35-3 at 1; ECF No. 35-5 at 1.)

Thereafter, the officers observed a trailer porch with open space beneath it and saw Flores lying on his stomach under the porch. (ECF No. 35-3 at 2; ECF No. 35-5 at 2.) Officer Agnew pointed his weapon at Flores and ordered him to come out with his hands up. (ECF No. 35-3 at 2; INV_00000233 at 34:15.) Flores complied and was placed into handcuffs. (ECF No. 35-3 at 2; INV_00000233 at 35:21.)

Thereafter, Officer Shea met up with Officer McNerney and positively identified Flores as the individual that Officer Shea had seen running from the Civic. (ECF No. 35 at 2; ECF No. 35-2 at 2.) Officer Hall then searched Flores and located a 9 mm bullet, a bag containing a crystal-like substance, which was later identified as

methamphetamine, $150 in cash, and three cylinder pills in a plastic bag, which were later identified as oxycodone.  (ECF No. 35 at 2; ECF No. 35-2 at 2; ECF No. 35-4 at 2.)

Officers Agnew, Hall, McNerney, and Zong-Liscum also found a Smith and Wesson 9 mm handgun in bushes and an additional $70 in cash.  (ECF No. 35 at 2; ECF No. 35-2 at 2; ECF No. 35-3 at 2; ECF No. 35-4 at 3; ECF No. 35-5 at 2; INV_00000238 at 0:33.)

**D.    Questioning of Flores**

After placing Flores in the police vehicle, Officer Hall informed Flores that he wanted to ask him some questions regarding his possession of a controlled substance and read Flores his *Miranda* rights.  (INV_00000235 at 4:11.)  When Officer Hall asked Flores if he understood the rights and wanted to speak with him, Flores nodded. (*Id.* at 4:21–4:24.)  Officer Hall then asked Flores numerous questions regarding his drug use.  In response, Flores informed Officer Hall that he had a drug problem and that all of the methamphetamine found on his person was for personal use.  (*Id.* at 4:26–4:29.) Officer Hall then told Flores that they had found gun casings in the car and a bullet in his pocket, and he asked Flores where the gun was.  (*Id.* at 4:30–4:47.)  Flores repeatedly denied knowing anything about a gun. (*Id.* at 4:47, 5:06, 5:57, 6:02.)

During their conversation, Flores informed Officer Hall that he had used a lot of methamphetamine that evening because his grandmother had died that day.  (*Id.* at 5:16–6:28.)  When asked to quantify how much methamphetamine he had used, Flores responded, "I used a lot because my tolerance is high."  (*Id.* at 6:40.)  When asked whether his having smoked methamphetamine was the cause of the confusion about where the gun was located, Flores insisted again that "there is no gun."  (*Id.* at 6:44.)

4

After Officer Hall finished questioning Flores, Officer Shea took over and read Flores the *Miranda* rights again. (INV_00000237 at 16:23.) During Flores's conversation with police officers that evening, he admitted, among other things, that he and his friend were trying to sell methamphetamine, that his friend was driving the Civic, and that the firearm, methamphetamine, and cash belongs to Flores. (ECF No. 35-2 at 2; INV_00000237.)

Flores continued to speak with officers during the following two days. (ECF No. 46-1 at 19–20, 22–24.) According to the police reports of those conversations, on each day, Flores was read his *Miranda* rights, he stated he understood his rights, and he nevertheless agreed to speak with officers. (*Id.*)

## II. BURDEN OF PROOF

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal citations and quotation marks omitted). Under the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment. *Id.*

It is undisputed that the officers did not have a warrant when they initially stopped Flores or when they searched his person. On a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at

which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id*. at nn.1–2 (citing authorities).

Flores has met this burden and demonstrated that his personal Fourth Amendment rights are implicated here. (*See generally* ECF No. 35.) He has therefore raised a *prima facie* case of a potential Fourth Amendment violation through a warrantless seizure and subsequent search, thus shifting the burden to the Government to justify the police officers' actions.

### III.  ANALYSIS

Flores argues for suppression on the grounds that the officers lacked reasonable, articulable suspicion to stop and frisk him. In determining whether Flores's Fourth Amendment rights were violated, the Court will consider the reasonableness of the officers' conduct at each stage of their April 17, 2019 encounter with Flores.

**A.      Pursuit of the Vehicle and Search of Flores**

1.      Legal Standard

Stop and frisk cases are governed by *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. Under the *Terry* standard, "a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004). Reasonable suspicion is an objective standard, and "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United*

*States v. Cortez*, 449 U.S. 411, 417 (1981). Although reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required . . . is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir. 2011) (internal quotation marks and brackets omitted). "Reasonable suspicion is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).

Where an officer conducting a *Terry* stop has a reasonable suspicion that the suspect may be armed and dangerous, a limited search for concealed weapons—a pat-down search or frisk—may be conducted. *See Adams v. Williams*, 407 U.S. 143, 146 (1972).

> The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . . So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.

*Id.* Thus, an officer conducting a pat-down search during a *Terry* stop must have reasonable suspicion of criminal activity to justify the initial stop, as well as separate reasonable suspicion that the suspect is armed to justify the pat-down. *See Rice*, 483 F.3d at 1082–83.

2. Analysis

Flores admits that the Civic was operating without the rear license plate being illuminated, which is a civil traffic infraction. (ECF No. 35 at 1, 7 (citing Colo. Rev. Stat.

§ 42-4-206(3)).)  He argues, however, that because Officer Shea had "observed no activity that led him to believe that the operator was committing any criminal violation," Officer Shea acted unreasonably by "provoking a high speed chase which placed the safety of others in jeopardy, and provided no lawful basis for the ensuing warrantless searches." (*Id.* at 10–11 (emphasis in original).)  According to Flores, because Officer Shea had no articulable evidence that Flores was a safety risk or had engaged in criminal conduct at the time that he attempted to conduct the initial traffic stop of the Civic, the subsequent frisk of Flores was not lawful.  (*Id.* at 9.)

Flores's argument misses the mark.  Once Officer Shea observed that the Civic had a broken taillight, he was entitled to conduct a routine traffic stop of the vehicle to investigate that civil violation.  *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation.").  Before Officer Shea could actually effectuate the traffic stop, however, the Civic sped away at a rate of approximately 65 miles per hour—approximately 35 miles per hour over the speed limit.  By merely conducting a U-turn, Officer Shea did not "provok[e]" a high speed car chase.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (characterizing a defendant's flight from the area at the sight of law enforcement approaching, as being an "unprovoked act").

Moreover, the determination of whether the officers had reasonable suspicion to conduct a *Terry* frisk of Flores is not judged from the moment that Officer Shea conducted a U-turn to pull over the Civic.[3]  At that time, there was no seizure for Fourth

---

[3] For this reason, any purported "[i]nconsistencies in Officer Shea's stated positions of why he decided to pursue the white [Civic]" raised by Flores are immaterial to the resolution of this Motion.  (ECF No. 55 at 1–5.)

Amendment purposes. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." (internal quotation marks omitted)); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (recognizing a fleeing defendant is not seized when a policeman yells "Stop, in the name of the law!"). Flores was not seized until he emerged from beneath the porch at the officers' command. This is the critical distinction for purposes of the Motion because anything that the officers learned before Flores emerged from beneath the porch can justify their subsequent search and seizure of Flores. *See, e.g.*, *Hodari D.*, 499 U.S. at 623–25 (noting that abandonment of contraband during pursuit may provide reasonable suspicion for subsequent seizure); *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) (holding that "a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest").

At the time that Officer Hall handcuffed and searched Flores, he had "a particularized and objective basis" to suspect that Flores had engaged in criminal activity, which warranted Flores's detention. *Cortez*, 449 U.S. at 417. After all, Flores was detained after he was discovered trespassing on private property after 2:00 a.m. and hiding under a porch in an area where two suspects had just fled from police after crashing a car. *See Wardlow*, 528 U.S. at 124 (although flight "is not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such"); *United States v. Wilson*, 2 F.3d 226, 232 (7th Cir. 1993) (recognizing that officers had reasonable suspicion to detain defendant who had fled from police and was discovered hiding

under a porch). The officers therefore had ample reason to suspect that Flores had engaged in criminal conduct, which warranted his initial detention.

The officers' conduct was also reasonable in scope in light of their suspicion that Flores might have been armed and dangerous. The police reports state—and Flores does not dispute—that Officer McNerney had already found a spent bullet casing in the center console of the Civic, and had informed the other officers of this discovery, before Officer Hall detained and searched Flores. (ECF No. 35-3 at 2; ECF No. 35-5 at 1.) This knowledge provided ample reasonable suspicion to believe that Flores might have been armed, which justified Officer Hall's protective search of Flores.[4] *See Rice*, 483 F.3d at 1082–83; *United States v. Meadows*, 571 F.3d 131, 142 (1st Cir. 2009) ("We think it uncontroversial that the discovery of ammunition—but not a gun—in the car from which a suspect fled could, together with the other facts present in this case, lead an officer to reasonably suspect that the fleeing suspect possessed the gun that went with the ammunition.").

Accordingly, because the *Terry* frisk of Flores was justified by a reasonable suspicion that Flores was armed and engaging in criminal activity, there is no Fourth Amendment violation warranting suppression of the evidence uncovered as a result of the search.

Moreover, even if the officers lacked reasonable suspicion to search Flores, the

---

[4] Flores alleges that the search was "an intrusive search of his person" rather than a pat-down or frisk. (ECF No. 35 at 10.) Because he does not develop this argument, he has waived this point. *See Philips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) ("[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)).

search would still be upheld as a search incident to arrest. By hiding under the porch, Flores gave the officers probable cause to believe that he had committed a separate crime of trespassing on private property. *See* Colo. Rev. Stat. § 18-4-504(1) ("A person commits the crime of third degree criminal trespass if such person unlawfully enters or remains in or upon premises of another."). And once that probable cause existed, the current state of Fourth Amendment case law gave the officers expansive authority to search Flores "incident to arrest." "A warrantless search preceding an arrest is a legitimate 'search incident to arrest' as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search"—and this is so "[w]hether or not the officer intended to actually arrest the defendant at the time of the search." *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). "[T]he legitimate basis [inquiry] is purely an objective standard and can be [satisfied by] *any crime*, not merely that for which the defendant is ultimately charged." *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) (emphasis in original). In short, by trespassing on private property, Flores gave the officers probable cause to justify the full search incident to arrest that subsequently occurred.

For the reasons explained above, Officer Hall's search of Flores was permissible and the evidence discovered therein will not be suppressed.

**B.  Search of the Civic**

Flores argues that evidence discovered from the Civic must be suppressed because the officers lacked probable cause to conduct a warrantless search of the vehicle. (ECF No. 35 at 13.) The Government argues, however, that Flores does not have standing to challenge the search of the Civic. (ECF No. 46 at 5–7.) The Court

agrees with the Government.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). Because Fourth Amendment rights are personal, "a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001). The burden is on the defendant to prove that his Fourth Amendment rights were violated by the challenged search or seizure and, therefore, that he has standing. *United States v. Soto*, 988 F.2d 1548, 1552–53 (10th Cir. 1993). "The court must determine whether the defendant has exhibited a subjective expectation of privacy in the area searched, and also whether society is willing to recognize that expectation as being objectively reasonable." *Id.* at 1552.

It is well-established that a passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have a legitimate expectation of privacy" in the vehicle protected by the Fourth Amendment. *Rakas*, 439 U.S. at 148–49; *United States v. Lewis*, 24 F.3d 79, 81 (10th Cir. 1994) ("*Rakas* provides the definitive teaching that a 'passenger *qua* passenger' has no reasonable expectation of privacy in a car that would permit the passenger's Fourth Amendment challenge to the search of the car."); *United States v. Worthon,* 520 F.3d 1173, 1178–79 (10th Cir. 2008); *DeLuca*, 269 F.3d at 1131–32; *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995); *United States v. Martinez*, 983 F.2d 968, 973–74 (10th Cir. 1992).

Flores admits that he was a mere passenger in, and did not own, the Civic. (ECF No. 35 at 14; ECF No. 35-2 at 3.) Although Flores claims "ownership" over items within the Civic (ECF No. 35 at 14), he does not argue that he had a reasonable expectation of privacy in the vehicle. Accordingly, the Court finds that Flores lacks standing to challenge the search of the Civic.

Even if Flores possessed some attenuated possessory interest and expectation of privacy in the vehicle—a dubious assumption in light of the weight of authority to the contrary—Flores abandoned the Civic and his possessory interest in the vehicle when he fled from the police. *See United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983) ("[A] warrantless search or seizure of abandoned property is not unreasonable under the Fourth Amendment."); *United States v. Vasquez*, 635 F.3d 889, 894 (7th Cir. 2011) (defendant lacked expectation of privacy in searched automobile after he abandoned it before fleeing on foot from the police); *United States v. Walton*, 538 F.2d 1348, 1351 (8th Cir. 1976) (party "had no standing to complain of [the warrantless] examination and search" of his car when he fled from police).

Accordingly, the warrantless search of the Civic was permissible and any evidence discovered therein will not be suppressed.

## C.     Flores's Post-Arrest Statements

### 1.     Legal Standard

"Waiver of one's Fifth Amendment privilege against self-incrimination requires that the individual 'voluntarily, knowingly and intelligently' waive his constitutional privilege." *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). This standard incorporates two distinct

requirements:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Colorado v. Spring*, 479 U.S. 564, 573 (1987).  This waiver inquiry "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (internal quotation marks omitted).

Where a *Miranda* violation is alleged and a defendant presents evidence or allegations sufficient to support a motion to suppress, "the Government must then carry the countervailing burden of proving a waiver of the constitutional privilege against self-incrimination." *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975) (abrogated on other grounds by *United States v. Bustillos-Munoz*, 510 F.2d 1129 (10th Cir. 1975)).  The Government bears the burden of proving by a preponderance of the evidence that a *Miranda* waiver was knowing and voluntary.  *Colorado v. Connolly*, 479 U.S. 157, 168–69 (1986).

   2.   Analysis

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  However, such a statement "is not inevitably either

necessary or sufficient to establish waiver." *Id.*

In determining whether Flores's waiver of his *Miranda* rights was voluntary, the Court first considers whether Flores was subjected to coercive police activity that renders his confession involuntary. *See Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"). Based upon the totality of the circumstances, a court considers "both the characteristics of the accused and the details of the interrogation." *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002). Relevant factors include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." *Id.*

Flores argues that "[t]he combination of heavy drug use, having a weapon pointed at him, and his mental state precluded his ability to freely and voluntarily waive his *Miranda* rights." (ECF No. 35 at 11.) Flores informed the officers that he had been using methamphetamine before his arrest and was mourning his loss of his grandmother at the time. (*Id.*) He further alleges that he also suffers from mental problems.[5] (*Id.*)

In the Tenth Circuit, a "state of intoxication does not automatically render a statement involuntary." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010); *United States v. Augustine*, 742 F.3d 1258, 1265 (10th Cir. 2014) ("The mere fact of drug or alcohol use will not suffice to overcome evidence showing that the defendant

---

[5] Flores does not explain the nature of his mental problems or provide any evidence by which the Court could evaluate this contention.

was sufficiently in touch with reality so that he knew his rights and the consequences of abandoning them." (internal quotation marks and citations omitted)). Instead, to warrant suppression, "[a] defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." *Id.*; *United States v. Curtis*, 344 F.3d 1057, 1065–67 (10th Cir. 2003) (finding a valid waiver where the defendant was allegedly under the influence of marijuana, crack cocaine, and alcohol); *Morris*, 287 F.3d at 988–89 (holding that a defendant knowingly and intelligently waived his *Miranda* rights while recovering from gunshot wounds in the hospital, despite his argument that his mental capacity was affected by pain, the effects of pain medication, and the post-traumatic stress associated with being shot multiple times in the back).

The Court finds that Flores's waiver of his privilege against self-incrimination was knowingly, voluntarily, and intelligently made. Although Flores admitted that he was high on methamphetamine and mourning the loss of his grandmother, his will was not "overborne" by the officers' actions.[6] He received numerous *Miranda* warnings on April 17, 2019 but continued to speak with officers after each warning. After viewing the videos of his post-arrest statements, the Court finds that Flores appeared alert, maintained eye contact, and spoke clearly over the course of several hours. He appeared to understand the officers' questions and provided detailed, responsive

---

[6] In observing the videos of Flores's questioning, the Court is troubled by the officers' suggestions that Flores may receive more lenient treatment if he answers their questions and cooperates with their investigation. However, because Flores does not raise this issue, the Court will not analyze this point. *See Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997) ("Issues not raised in the opening brief are deemed abandoned or waived."); *Meyer v. Bd. of Cnty. Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007) ("[W]e are not charged with making the parties' arguments for them.").

16

answers.  He was not subjected to physical punishment[7] or hostile questioning in which the officers raised their voices.  The evidence does not suggest that Flores was impaired to such a degree that he was not fully aware of the nature of the Fifth Amendment rights that he was abandoning, or the potential consequences of waiving those rights.  Instead, a preponderance of the evidence shows that Flores made an uncoerced choice to speak with officers with the requisite level of comprehension.

Lest there be any doubt about whether Flores's decision to speak with officers was voluntary, it is significant that Flores continued to speak with officers after receiving new *Miranda* warnings on the two days following his arrest.  (ECF No. 46-1 at 19–20, 22–24.)  This fact also supports the Court's finding that his decision to speak with officers on April 17, 2019 was voluntary.

For the reasons explained above, the Court finds that Flores voluntarily, knowingly, and intelligently waived his privilege against self-incrimination.  The Court therefore denies Flores's request to suppress his post-*Miranda* statements.[8]

---

[7] In his reply, Flores argues for the first time that the officers ignored his requests for medical treatment.  (ECF No. 55 at 9.)  By not raising this argument in his opening brief, Flores has waived this argument.  *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived.").  Regardless, the Court finds that this assertion is contradicted by the video evidence.  Flores was taken to the hospital by the officers that evening.  He was released after approximately 30 minutes.  (INV_00000237 at 59:40–1:35:00.)

[8] In his reply, Flores argues—again for the first time—that he was also unlawfully interrogated before he received his *Miranda* rights.  (ECF No. 55 at 5.)  By not raising this argument in his opening brief, Flores has waived this argument.  *See Harrell*, 642 F.3d at 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived.").  The Court therefore will not analyze whether Flores's pre-*Miranda* statements should be suppressed.  The Court notes, however, that the pre-*Miranda* conversation was relatively brief.  Moreover, several of the questions asked were routine booking questions or questions designed to protect the officer's safety.  *See United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (officer's question regarding whether defendant had any guns or sharp objects on him falls within the public safety exception); *United States v. Lara-Garcia*, 478 F.3d 1231,

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS that Flores's Motion to Suppress and Request for Evidentiary Hearing (ECF No. 35) is DENIED.

Dated this 8th day of September, 2020.

BY THE COURT:

William J. Martinez
United States District Judge

---

1235 n.3 (10th Cir. 2007) (agent's inquiry into defendant's name and birthplace within routine booking exception); *United States v. Bishop*, 66 F.3d 569, 572 (3d Cir. 1995) (officer's inquiry about defendant's limp within routine booking exception because it was used to determine if defendant needed medical attention).